# Exhibit A

```
 1                UNITED STATES DISTRICT COURT
 2             FOR THE WESTERN DISTRICT OF TEXAS
 3                       AUSTIN DIVISION
 4   ZOHO CORPORATION,              )
                                    )
 5             Plaintiff,           )
                                    )
 6     VS.                          ) CIVIL ACTION NO.
                                    ) 1:22-CV-00037
 7   LIBERTY PEAK VENTURES, LLC,    )
                                    )
 8             Defendant.           )
                                    )
 9
10
11
12
13
14
15      REMOTELY CONDUCTED VIDEOTAPED DEPOSITION OF
16               JOSÉ LUIS MELÉNDEZ, PH.D.
17                 Mayagüez, Puerto Rico
18               Monday, February 20, 2023
19
20
21
22
     Reported via webconference by:
23   LYDIA ZINN
     RPR, FCRR, CSR No. 9223
24   Job No.  SF 5771887
25   PAGES 1 - 171
```

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE WESTERN DISTRICT OF TEXAS
 3                      AUSTIN DIVISION
 4  ZOHO CORPORATION,         )
                              )
 5         Plaintiff,         )
                              )
 6   VS.                      ) CIVIL ACTION NO.
                              ) 1:22-CV-00037
 7  LIBERTY PEAK VENTURES, LLC, )
                              )
 8         Defendant.         )
                              )
 9
10
11
12
13
14         Remotely conducted videotaped deposition
15  of JOSÉ LUIS MELÉNDEZ, PH.D., taken on behalf of
16  Plaintiff, at Mayagüez, Puerto Rico, beginning at
17  12:02 p.m. and ending at 4:42 p.m., on Monday,
18  February 20, 2023, before LYDIA ZINN, Certified
19  Shorthand Reporter No. 9223.
20
21
22
23
24
25
                                              Page 2
```

```
 1  APPEARANCES (via webconference):
 2  For Plaintiff Zoho Corporation:
        Marton Ribera Schumann Chang
 3      548 Market Street
        Suite 36117
 4      San Francisco, CA  94104
        (415) 360-2515
 5      ryan@martonribara.com
        phaack@martonribara.com
 6   BY:  RYAN MARTON
          PHILLIP HAACK
 7
     For Defendant Liberty Peak Ventures, LLC:
 8      Platt Cheema & Richmond PLLC
        1201 North Riverfront Boulevard
 9      Suite 150
        Dallas, TX  75207
10      (514) 559-2700
        macosta@pcrfirm.com
11   BY:  MATTHEW C. ACOSTA
12
13  Also Present:
        Kevin Del Cid, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 3
```

```
 1                    I N D E X
 2  Monday, February 20, 2023
 3
    WITNESS                                     PAGE
 4  JOSÉ LUIS MELÉNDEZ, PH.D.
    (SWORN)                                       6
 5  Examination by Mr. Marton                     6
 6
 7  EXHIBITS MARKED FOR IDENTIFICATION          PAGE
    EXHIBIT 1   Expert Declaration of
 8       Dr. José Luis Meléndez
         Regarding Claim Construction           11
 9
    EXHIBIT 3   US Patent No. 9,373,122          17
10
    EXHIBIT 4   US Patent No. 10,074,088         33
11
    EXHIBIT 5   US Patent No. 10,956,901         33
12
    EXHIBIT 6   Office Action Response from
13       the prosecution of the '122
         Patent                                 128
14
    EXHIBIT 10  Original Claims when the '122
15       Patent was first filed                 147
16
17
18
19
20
21
22
23
24
25
                                              Page 4
```

```
 1              Mayagüez, Puerto Rico
 2         Monday, February 20, 2023, 12:02 p.m.
 3         THE VIDEOGRAPHER:  Good morning, everybody.
 4   We're going on the record today at 11:03 a.m. [sic].
 5   Today's date is February 20, 2023.           12:02:48
 6       Please note that the microphones are sensitive and
 7   may pick up any whispering and private conversations.
 8   Please mute your phones at this time.
 9       Audio and video recording will continue to take
10   place unless all parties agree to go off the record.  12:03:07
11       This is Media Unit Number 1 in the video-recorded
12   deposition of Jose Melendez taken by counsel for
13   plaintiff in the matter of Zoho Corporation versus
14   Liberty Peak Values [sic] LLC [sic].  This case is
15   filed in the United States District Court for the    12:03:23
16   Western District of Texas, Austin Division.  The Civil
17   Action Number is 1:22-cv-37.  This deposition is being
18   conducted remotely using virtual technology.
19       My name is Kevin Del Cid, representing Veritext.
20   I'm the videographer.  The court reporter today is   12:03:42
21   Lydia Zinn, representing Veritext as well.  I'm not
22   related to any party in this action, nor am I
23   financially interested in the outcome.
24       If there are any objections to the proceeding,
25   please state them at the time of your appearance.    12:03:56
                                                          Page 5
```

2 (Pages 2 - 5)

```
 1        THE WITNESS: I only reviewed the Provisional    12:35:18
 2   Application to the extent it was within the File
 3   History, and relevant to the claim terms that I opined
 4   on.
 5   BY MR. MARTON:                                        12:35:32
 6   Q.  Okay. Do you know if the Provisional Application
 7   includes a written description sufficient to support
 8   the claims of the Asserted Patents?
 9        MR. ACOSTA: Objection. Scope.
10        THE WITNESS: That wasn't something I was         12:35:44
11   asked to look at.
12   BY MR. MARTON:
13   Q.  Okay. So you don't know?
14        MR. ACOSTA: Objection. Form.
15        THE WITNESS: I -- I -- I have no opinion on      12:35:52
16   that.
17   BY MR. MARTON:
18   Q.  Okay. So regarding the Asserted Patents in this
19   case, you have testified that you've reviewed them
20   carefully. Is that correct?                           12:36:15
21   A.  I -- I reviewed them carefully enough to support
22   the opinions on the terms that I've opined on.
23   Q.  Do you -- having -- having read the patents, do
24   you have a good understanding of what the inventors
25   invented, as reflected in those patents?              12:36:32
                                                    Page 26
```

```
 1   perceive to be the scope are the same; and those are   12:37:47
 2   laid out by the exact claim language in the claims.
 3   BY MR. MARTON:
 4   Q.  Okay. Looking back at Exhibit 3, which is the
 5   '122 Patent, can you -- can you look at that again?    12:38:07
 6   A.  Yes. It's open again.
 7   Q.  Great.
 8        Did you read the section that begins in Column 1
 9   and ends in Column 2 titled "Background of the
10   Invention"?                                            12:38:27
11   A.  I'm sure I would have read it. Yes.
12   Q.  And this section refers to prior art systems.
13   Correct?
14   A.  I don't know offhand what the section refers to.
15   I'd have to read it. Again, it's been a -- it's been a  12:38:49
16   little while. Usually it does and it's entitled
17   "related art."
18   Q.  Right.
19        Does this background section define the problem
20   that the invention is directed at solving?             12:39:05
21        MR. ACOSTA: Objection. Form.
22        THE WITNESS: I don't know that it defines
23   it; but normally these sections I find to be useful in
24   describing the art and technology that -- that relates
25   to the -- that -- to the area that the patent's        12:39:27
                                                    Page 28
```

```
 1        MR. ACOSTA: Objection. Form.                     12:36:35
 2        THE WITNESS: I'd say I have a good
 3   understanding of what they invented, as laid out in the
 4   scope of the claims.
 5   BY MR. MARTON:                                         12:36:46
 6   Q.  Okay. Can you describe in your own words what the
 7   inventors invented?
 8   A.  No, I can't. That would be too difficult. That's
 9   why the claim words are there.
10   Q.  Do you have anything to say about the nature of    12:37:05
11   the invention in your own words?
12        MR. ACOSTA: Objection. Vague. Objection.
13   Form.
14        THE WITNESS: Not beyond what I've -- I've
15   included in my report.                                 12:37:16
16   BY MR. MARTON:
17   Q.  I mean, your report doesn't define the invention,
18   so I -- it's just -- you're hired as an expert in this
19   case. And -- and I just wanted to hear your own
20   articulation of what you perceive to be the invention  12:37:28
21   covered by the three Asserted Patents.
22   A.  I appreciate --
23        MR. ACOSTA: Objection.
24        THE WITNESS: My understanding as an expert
25   is that what is actually the scope and what I should   12:37:43
                                                    Page 27
```

```
 1   involved with.                                         12:39:32
 2   BY MR. MARTON:
 3   Q.  Do you know what the Asserted Patents -- what
 4   problem the Asserted Patents are directed at solving?
 5        MR. ACOSTA: Objection. Form.                     12:39:45
 6        THE WITNESS: Well, I know that they're, like
 7   we read earlier, related to securely processing
 8   customer account data.
 9   BY MR. MARTON:
10   Q.  Well, what are they securing the customer account  12:40:02
11   data against?
12   A.  Well, that -- that would be laid out specifically
13   in the claims. Do you want me to look at the claims?
14   Q.  Not yet. Not yet.
15        I'm going to walk you through some portions of -- 12:40:27
16   of this background section, and see if I can refresh
17   your recollection about the problem that these patents
18   purport to solve. Okay?
19   A.  It's -- I'm not sure what the question was. I
20   think you said you're going to read some things, and if 12:40:49
21   that's what you're going to do, then that's fine with
22   me.
23   Q.  Okay. So you can see in Exhibit 3, which is the
24   '122 Patent, at Column 1, around line 21, it says:
25   "The proliferation of rogue programs, such as viruses,  12:41:12
                                                    Page 29
```

```
 1  patent claim is -- is likely to give you an accurate    12:53:33
 2  answer, so, no, I -- I don't have words beyond what's
 3  in the claims.
 4  BY MR. MARTON:
 5  Q.  Okay.  Well, let's take a look at the claims.       12:53:42
 6      Can you look at Claim 1 of the '122 Patent, which
 7  is at Column 10 of Exhibit 3?
 8  A.  I have it open in front of me.
 9  Q.  Take a look at the second-to-last element of this
10  claimed method.  Can you do that?                       12:54:17
11  A.  Second-to-last element.
12      I believe you mean the securely storing the
13  account information at the browser toolbar?
14  Q.  Yes.
15  A.  Okay.  Yes, I'm there.                              12:54:32
16  Q.  So we can agree that Claim 1 is a method.
17  Correct?
18  A.  Claim 1 of the '122 is a method claim, yes.
19  Q.  Okay.  And one of the method steps is that account
20  information be securely stored at the browser toolbar.  12:54:54
21  Can we agree with that?
22  A.  No.  I'm not sure.  Changing words around usually
23  results in changing meanings.
24      We can agree that one of the method steps is
25  securely storing the account information at the browser 12:55:09
                                                            Page 38
```

```
 1  toolbar.                                                12:55:13
 2  Q.  Okay.  So how would a person of ordinary skill in
 3  the art determine if account information is securely
 4  stored, such that it meets this claim requirement?
 5  A.  Is -- your question is how would a person of        12:55:43
 6  ordinary skill in the art -- how would they determine
 7  if this limitation is met?
 8  Q.  Correct.
 9      MR. ACOSTA:  Objection.  Form.
10      THE WITNESS:  Well -- well, they would need         12:55:55
11  to look at -- and you're saying in -- in some product
12  or what -- where?
13  BY MR. MARTON:
14  Q.  Sure.  In a -- in a process.
15  A.  Okay.                                               12:56:05
16      So you would need to look at whether or not there
17  is a step of securely storing, and that step of
18  securely storing is of some account information, and
19  that's done at the browser toolbar, as opposed to -- to
20  somewhere else in the system.                           12:56:27
21  Q.  So how do you determine if the act of storing is
22  done securely?
23  A.  Well, you would look at the implementation, and
24  see if it's done securely or not.
25  Q.  Is storing data to RAM securely?                    12:56:53
                                                            Page 39
```

```
 1      MR. ACOSTA:  Objection to form.                     12:56:59
 2      THE WITNESS:  It could, depending upon how
 3  it's stored.
 4  BY MR. MARTON:
 5  Q.  How?  Tell me more about that.  What do you mean,   12:57:09
 6  "depending on how it's stored."  Depending on what?
 7      MR. ACOSTA:  Objection.  Form.
 8      THE WITNESS:  Well, for example, if it were
 9  stored in a nonencrypted form with a Web link that was
10  published to it, that that wouldn't be very secure.     12:57:24
11  BY MR. MARTON:
12  Q.  Right.  So that would not be secure storing.  I'm
13  going to come back to that.
14      Actually, let me ask you a question.  If it's --
15  if it's stored to RAM in an unencrypted form, is it     12:57:42
16  securely stored?
17      MR. ACOSTA:  Objection.  Form.  Objection.
18  Scope.
19      THE WITNESS:  It's not something I looked at;
20  but it certainly could be, depending upon what else was 12:57:53
21  going on.
22  BY MR. MARTON:
23  Q.  What else do you need to know?
24  A.  Well --
25      MR. ACOSTA:  Objection.  Form.  Objection.         12:58:10
                                                            Page 40
```

```
 1  Scope.                                                  12:58:12
 2      THE WITNESS:  I could hide a coin under a
 3  rock, on a beach.  Or I can hide a coin under a rock on
 4  a beach, and let you know where the beach is and where
 5  the rock is; give you some coordinates, so...           12:58:24
 6  BY MR. MARTON:
 7  Q.  I like your coin on a beach under a rock
 8  comparison.  And we may actually end up using that.
 9  I'm going to come back to the RAM issue later.
10      First, I want to ask you, with respect to this     12:58:51
11  claim element -- securely storing account information
12  at the browser toolbar -- does the account information
13  need to be secure against something in particular, in
14  order to be deemed securely stored?
15      MR. ACOSTA:  Objection.  Form.                     12:59:12
16      THE WITNESS:  I -- I don't think the claim is
17  laying out that.
18      It just says "securely stored."  For this
19  particular limitation, it's just securely storing the
20  account information at the browser toolbar.             12:59:25
21  BY MR. MARTON:
22  Q.  Well, secure against what?
23      MR. ACOSTA:  Objection.  Form.
24  BY MR. MARTON:
25  Q.  To determine if something is secure, don't you     12:59:40
                                                            Page 41
```

11 (Pages 38 - 41)

```
 1  need to know what it is secure against?          12:59:42
 2       MR. ACOSTA:  Objection.  Form.
 3       THE WITNESS:  I thought we described that,
 4  actually, previously, in terms of some examples of --
 5  of that.                                         12:59:56
 6  BY MR. MARTON:
 7  Q.  Okay.  So we did talk about security -- securely
 8  storing against viruses, Trojan horses, and computer
 9  hackers.  Is that what you're referring to?
10  A.  Well, you had talked about that.             13:00:13
11      I -- I just said inappropriately accessing.  Those
12  were some examples that were given of how one might
13  inappropriately access it.
14      Obviously, you want the data to be accessed by
15  who's -- who's supposed to have access to it.    13:00:34
16  Q.  I'm not sure I understand.
17      So in order to determine if information is secure,
18  as required by the claim, do you -- don't you need to
19  know what it is secure against?
20      MR. ACOSTA:  Objection.  Form.               13:00:58
21      THE WITNESS:  I think you're -- you're
22  misreading the claim limitation, so --
23      And I asked you that -- a little bit earlier,
24  because you paraphrased the claim limitation.
25      But the claim limitation is not what you just 13:01:09
                                                      Page 42
```

```
 1  said; it's securely storing the account information at 13:01:11
 2  the browser toolbar.
 3  BY MR. MARTON:
 4  Q.  So if you securely store something, it's securely
 5  stored.  Correct?                                13:01:22
 6  A.  Not necessarily forever.  So I -- I guess it would
 7  depend.  Here in this -- sorry.  Here, there's another
 8  limitation after this, which is related to removing the
 9  stored account information, so it -- that at least puts
10  a bound on -- on it being stored, I suppose, until it's 13:01:56
11  removed.
12  Q.  Okay.  So let's go with that.
13      So it would be securely stored until it's
14  removed -- is that correct? -- for this claim?
15  A.  I guess that's not strictly speaking -- that's not 13:02:22
16  something I looked at, so I'm -- everything I've said
17  for the last ten minutes are things I'm -- I'm just
18  looking at, at the fly, and trying to give you some
19  response to; but obviously I didn't analyze these
20  things.                                          13:02:39
21  BY MR. MARTON:
22  Q.  Okay.  What I'm trying to understand -- and you --
23  you did look at the claim element:  securely storing
24  the account information at the browser toolbar.
25  Correct?                                         13:02:47
                                                      Page 43
```

```
 1  A.  I looked at it in the context of the claim   13:02:48
 2  construction; not in terms of applying it to -- to a
 3  hypothetical product.
 4  Q.  Okay.  But you understand what it means to
 5  securely store account information at the browser 13:03:00
 6  toolbar, as required by this claim?
 7  A.  I have an understanding that would be consistent
 8  with a person of ordinary skill in the art.
 9  Q.  Okay.  Can you give me an example of securely
10  storing account information at the browser toolbar 13:03:18
11  that's described in this '122 specification?
12      MR. ACOSTA:  Objection.  Form.
13      THE WITNESS:  I think I have two examples in
14  my declaration:  One related to having it there in
15  encrypted form, when encryption is obviously a way of 13:03:38
16  securing data.  And then also in terms of limiting the
17  time in which it's -- it's there, or in which it's
18  exposed by, you know, the time needed to use it.
19  BY MR. MARTON:
20  Q.  Where in your declaration are you pointing to? 13:03:57
21  A.  I'm not pointing.
22      This is just based on my recollection.
23      Do you want me to --
24  Q.  Yes.  Please direct me to that.  I -- I -- I
25  believe it's in paragraph 33.  Is that correct?  13:04:10
                                                      Page 44
```

```
 1  A.  Working my way to paragraph 33.              13:04:36
 2  Q.  Of Exhibit 1?
 3  A.  Of Exhibit 1.  Let me read it.  Yeah.  In fact, I
 4  say there it's an additional example, which suggests
 5  that there's a prior example before 33.          13:05:03
 6  Q.  Okay.  So what's the example in paragraph 33 of
 7  securely storing?
 8  A.  Limiting the amount of time the information is
 9  maintained.
10  Q.  So that's the removal of the stored account  13:05:18
11  information from the toolbar after completion of the
12  transaction?  Is that correct?
13      MR. ACOSTA:  Objection.  Form.
14      THE WITNESS:  I don't know about completion
15  of the transaction.                              13:05:28
16      I have to go back to look at the claim.  I don't
17  recall it saying that.  Do you want me to go back and
18  look at that?
19  BY MR. MARTON:
20  Q.  Claim 1 does say that -- of the '122 Patent.  13:05:41
21  A.  I just don't recall that, so let me look at that,
22  if that's okay.  I'm pulling it back up.  I just don't
23  recall the -- the precise wording.  "Removing the
24  stored account information from the browser toolbar
25  after completion of the transaction."            13:06:03
                                                      Page 45
```

| | |
|---|---|
| 1  So if that's what you said, then yes.         13:06:06<br>2  Q.  That is.<br>3  A.  That would be an example of that.<br>4  Q.  Okay.  So you're -- you're telling me that an<br>5  example of securely storing is storing for a limited   13:06:13<br>6  amount of time, wherein it's deleted after use?  Is<br>7  that correct?<br>8       MR. ACOSTA:  Objection.  Form.<br>9       THE WITNESS:  That's one that's -- yeah.  I<br>10 think that's fair.                    13:06:34<br>11 BY MR. MARTON:<br>12 Q.  So that's one example, according to you, of<br>13 securely storing account information at the browser<br>14 toolbar?<br>15 A.  Well, I think it's according to the patent,   13:06:48<br>16 actually, because it's -- I think one of the dependent<br>17 claims says that.  If we go back in that same paragraph<br>18 that we were looking at, you'll see there's a citation<br>19 there.<br>20 Q.  Lines 6 and 16 of the '901 Patent?        13:07:08<br>21 A.  That's what it says there.<br>22 Q.  And Claim 3 of the '088 Patent?  Is that correct<br>23 that's what it says?<br>24 A.  That's -- those are the references there.<br>25    I'd have to go back to those patents and claims to  13:07:32<br>Page 46 | 1  section?                              13:10:02<br>2  Q.  Yes, please.<br>3  A.  Okay.  It says: "This is consistent with the<br>4  specification describing a browser and receiving data<br>5  that is then 'transmitted to the browser toolbar.'"   13:10:09<br>6     "Also, the term 'e-wallet,' one method of secure<br>7  storage, is explicitly described as the storage<br>8  extension of the toolbar software program."<br>9     And so that's referenced in the patent, for<br>10 example, '122, at 4:14.                13:10:29<br>11 Q.  So can you explain to me what you meant here by --<br>12 how is this an example of securely storing account<br>13 information at the browser toolbar?<br>14 A.  Well, because we know that patent discloses one of<br>15 the Preferred Embodiments as having the e-wallet as   13:10:53<br>16 part of the toolbar, and so we can see here that an<br>17 e-wallet is a secure -- is a method of secure storage.<br>18 Q.  What is secure about an e-wallet?<br>19       MR. ACOSTA:  Objection.  Form.<br>20       THE WITNESS:  That's the whole purpose of an   13:11:19<br>21 e-wallet, is it provides secure storage.<br>22    There's different ways that would be known by a<br>23 person of ordinary skill in the art in terms of how to<br>24 do that.<br>25<br>Page 48 |
| 1  confirm the citation if that's what you want.    13:07:34<br>2  Q.  No, I don't need you to confirm it.<br>3     That's what you wrote in your declaration?<br>4  A.  Yes.<br>5  Q.  And presumably you're accurate in your       13:07:41<br>6  declaration.  Is that correct?<br>7  A.  I hope so. I -- everybody makes mistakes, but I --<br>8  I try to be careful.<br>9  Q.  So, other than deleting account information after<br>10 use as an example of securely storing account   13:07:55<br>11 information, are there any other examples of securely<br>12 storing account information at a browser toolbar<br>13 reflected in the Asserted Patents?<br>14 A.  Yes.  I'm sure there are.<br>15    I think I highlighted an additional example in my  13:08:13<br>16 declaration.<br>17 Q.  And where is that?<br>18 A.  Well, when we were reading 33, it said the<br>19 dependent claim provides additional examples; so I'm<br>20 guessing it must be somewhere in that same section --  13:08:31<br>21 Q.  Okay.  Why don't you go ahead and find that and --<br>22 and point it out to me.<br>23 A.  Okay.  There may be more than one additional<br>24 example, but I have at least one additional example in<br>25 paragraph 26.  Do you want me to read the relevant   13:09:53<br>Page 47 | 1  BY MR. MARTON:                           13:11:33<br>2  Q.  Okay.  Now, does the patent -- the Asserted<br>3  Patents -- and let's refer to the '122, just for<br>4  ease -- does it describe or define what an e-wallet is?<br>5  A.  It describes what -- at least describes an    13:11:51<br>6  e-wallet.  That would certainly be something that would<br>7  be known by a person of ordinary skill in the art in<br>8  the 2008 time frame.<br>9  Q.  Okay.  If you could take a look at Exhibit 3,<br>10 which is the '122 Patent, at Column 3, line 63.     13:12:08<br>11 A.  I'm there.<br>12 Q.  It says -- I'm going to read it -- "An e-wallet,<br>13 as used herein, refers to any data storage<br>14 implementation which allows data associated with a<br>15 customer to be stored and used to make electronic" --   13:12:47<br>16 "electronic commerce transactions."<br>17    Do you see that?<br>18 A.  Yes.<br>19 Q.  Do you read that as a definition of an e-wallet<br>20 for this patent?                       13:12:57<br>21 A.  I wouldn't say it's a -- a definition.  But<br>22 it's -- it's a description of what they intend to mean<br>23 when they say it.<br>24 Q.  Why -- why is it not a definition?<br>25 A.  Well, because it's -- it says it refers to that.    13:13:14<br>Page 49 |

```
 1  question now?  Now I have it in front of me.         13:19:22
 2  BY MR. MARTON:
 3  Q.  Could storage of account information in RAM meet
 4  the requirement of Claim 1 of securely storing the
 5  account information at the browser toolbar?           13:19:37
 6  (Cross talk.)
 7       MR. ACOSTA: Objection.  Objection.  Scope.
 8       THE WITNESS: Yeah.  That limitation could be
 9  met, dependent, again, on how it's stored within the --
10  the RAM --                                            13:19:50
11  BY MR. MARTON:
12  Q.  Okay.
13  A.  -- the browser toolbar.
14  Q.  And -- when you say depending on how it's stored,
15  can you tell me what you mean by that?                13:19:58
16  A.  Sure.  Well, I gave you an example of, you know,
17  not -- not having it encrypted, and providing a --
18  publishing a -- a publicly available URL to it.  So
19  that -- that was one example.
20  Q.  Okay.  Let me stop you at that example.           13:20:17
21      If it's not encrypted, and it's stored in RAM, but
22  you don't share a publicly available URL, is that
23  securely storing per the requirement of the
24  '122 Patent?
25       MR. ACOSTA: Objection.  Form.  Objection.        13:20:34
                                                          Page 54
```

```
 1  Scope.                                                13:20:35
 2       THE WITNESS: I would have to look at, you
 3  know, a system to say that completely; but I would say
 4  that it certainly could meet this limitation.
 5  BY MR. MARTON:                                        13:20:45
 6  Q.  What would you have to look at in the system to
 7  make that determination?
 8  A.  To see -- I would have to see if there was some --
 9  you know, some other place where it was stored in the
10  RAM that was obviously not secure; you know, like in a 13:21:01
11  cookie or, you know, searchable cache; something like
12  that.
13  BY MR. MARTON:
14  Q.  If it wasn't in a searchable cache or cookie, but
15  it was stored in RAM, would it be securely stored?    13:21:23
16       MR. ACOSTA: Objection.  Form.
17       THE WITNESS: I was just giving you some
18  examples.  This isn't something I looked at for my --
19  my report.
20  BY MR. MARTON:                                        13:21:35
21  Q.  Just merely storing something in RAM without
22  knowing anything else, you would not know whether or
23  not that would be securely storing, according to the
24  patent.  Is that correct?
25       MR. ACOSTA: Objection.  Form.                    13:21:44
                                                          Page 55
```

```
 1       THE WITNESS: I think that without knowing        13:21:47
 2  anything else -- I mean, obviously, running programs
 3  are always storing things in RAM, so... and not
 4  everything is secure.
 5      So, yeah, I would -- I would need to -- to, you   13:21:58
 6  know, see if that RAM, for example, was only accessible
 7  by the toolbar, then obviously that -- that would be
 8  secure.
 9      If it was accessible openly, then -- then that
10  wouldn't be securely storing unless you had another   13:22:16
11  mechanism.  You know, basically a person of ordinary
12  skill in the art understands that there's a lot of -- a
13  lot of -- of a lot of different ways of securely
14  storing.  And this is just one of the limitations,
15  obviously, here so...                                 13:22:34
16  BY MR. MARTON:
17  Q.  Yeah.  Well, what does the patent describe as a
18  way in which you would securely store account data,
19  other than putting it in an e-wallet, and other than
20  removing it -- removing the account data from the     13:22:51
21  browser toolbar after use?
22       MR. ACOSTA: Objection to form.
23       THE WITNESS: Well, other secure storage
24  within the toolbar.
25
                                                          Page 56
```

```
 1  BY MR. MARTON:                                        13:23:05
 2  Q.  What other secure storage is described in the
 3  patent?
 4  A.  I think we just looked at that section.  I'd have
 5  to look at the whole patent if -- if there was other   13:23:15
 6  annotations; but at least in the 14:60 -- I think it
 7  was.  Can I go into that to see or...
 8  Q.  What's the 14:60?
 9  A.  I thought that was the section.  I'm going off of
10  memory here, but -- because we're jumping around the   13:23:31
11  references.  But in my report, it was the second
12  example that I gave you.  I think there were three
13  examples in my report.
14  Q.  I only heard two examples.
15      And I don't know what 14:60 refers to.  I heard    13:23:47
16  two examples.  Let me go through them.
17      One was storing in an e-wallet as an example of
18  securely storing at the browser toolbar.  Correct?
19  A.  I'd have to go back and look.  I know that I was
20  going through the section, and I ran into that example, 13:24:05
21  which wasn't the one I was actually looking for; but
22  I -- I mentioned there's -- that this would be another
23  example, but that there was probably a third example.
24  Q.  Okay.  Lets go -- let's get ordered here.
25  Let's -- let's just really quickly get ordered here.   13:24:20
                                                          Page 57
```

15 (Pages 54 - 57)

**Page 58**

1    So in paragraph 26 of your declaration, you   13:24:23
2  pointed to -- or you -- you've testified that
3  paragraph 26 of your declaration identifies one example
4  of securely storing account information as securely
5  storing account information in an e-wallet.  Is that   13:24:38
6  correct?
7  A.  So what's happening -- when you ask -- when you're
8  bouncing back and forth between the exhibits, I'm
9  switching in my Exhibit Share here.  And I go to that
10 exhibit.   13:24:52
11    But basically I have to find still where you are,
12 because it sends me to the -- the beginning.
13    So right now I'm just trying to find where you
14 told me to go to.
15 Q.  Paragraph 26 of your declaration, which is   13:25:06
16 Exhibit 1.
17 A.  Okay.  So I'm in there, at 26.  And this was the
18 one example that -- that second example that I found
19 when I was looking for -- what in order of the reports,
20 the first example, which would be the third example   13:25:24
21 that we haven't talked about yet.
22 Q.  Okay.  So let's try and -- try and be clear here.
23    So one example is here in paragraph 26.  According
24 to you, the patent describes storing in an e-wallet as
25 an example of securely storing account information at   13:25:45

**Page 59**

1  the browser toolbar.  Is that correct?   13:25:48
2  A.  Well, e-wallet is one example of securely -- of
3  secure storage.
4  Q.  Now, you also directed our attention to
5  paragraph 33 of your declaration, where you said as   13:26:07
6  another example of securely storing account information
7  at a browser toolbar, the data is stored for a limited
8  time, wherein it's deleted from the browser toolbar,
9  for example, after use.
10    Is that correct?   13:26:26
11 A.  I remember discussing that, yes.
12 Q.  Okay.  So those are two examples, according to
13 you, of securely storing.
14    Can you give me another example of securely
15 storing account information at the browser toolbar?   13:26:38
16 A.  Yes.  Just using a secure storage, that would be
17 part of the -- the browser toolbar.  And that's --
18 (Cross talk.)
19 BY MR. MARTON:
20 Q.  Sorry.  I don't mean to cut you off.  Go ahead.   13:26:55
21 Go ahead.
22 A.  That's also there in 26.
23 Q.  And what are you pointing to in 26 specifically?
24 A.  It's the third sentence that says:  "Also, the
25 term 'e-wallet,' one method of secure storage, is   13:27:09

**Page 60**

1  explicitly described as the external extension of the   13:27:13
2  toolbar software program."
3     Well, and it was 4:14.  Sorry.  Not -- I had
4  guessed 4:60.  But I was wrong.
5  Q.  What are you referring to:  4:14?   13:27:27
6  A.  Of the '122.  It says the '122 Patent at 4:14.
7  Q.  Right.  So how is this different than what you
8  previous -- previously pointed to?
9     So you had said that, as an example of securely
10 storing account information at a browser toolbar is --   13:27:51
11 is storing the account information in an e-wallet.
12    Is this somehow different than that?
13 A.  Yes.  So I think what may be confusing you is
14 that, where the browser toolbar has a secure storage,
15 that's a more general example.  Where that secure   13:28:14
16 storage is also an e-wallet, that's a more specific
17 example.
18    So we were focused on the e-wallet, but if you
19 look here, what it's talking about more generally is
20 secure storage.   13:28:30
21 Q.  I'm confused.
22    So you're telling me there is storage at the
23 browser toolbar, and then there's, separate, an
24 e-wallet storage; and those are two different secure
25 storage methods?  Is that what you're telling me?   13:28:49

**Page 61**

1     MR. ACOSTA:  Objection.  Form.   13:28:52
2     THE WITNESS:  Well, it says it right there in
3  my report, that an e-wallet is one method of secure
4  storage.
5  BY MR. MARTON:   13:29:00
6  Q.  Okay.
7  A.  It's not -- it's not all methods of secure
8  storage.
9  Q.  Right.  So I'm trying to identify with you the
10 different examples described in the patent of securely   13:29:07
11 storing account information at the browser toolbar.
12    Now, we talked about what was in paragraph 33 of
13 your declaration, which is the deletion of the account
14 information after use.  Right?  So that's one example.
15 Right?   13:29:27
16 A.  We talked about that topic.  I don't remember
17 exactly all the questions and answers, but we...
18 Q.  Okay.
19 A.  We did discuss that one.
20 Q.  And then, separately, we also talked about storing   13:29:37
21 the account information in an e-wallet as another
22 example of securely storing account information at the
23 browser toolbar.  Is that correct?
24 A.  Correct.  Yes.
25 Q.  And now is there a third example in the patent of   13:29:51

| | |
|---|---|
| 1  securely storing account information at the browser   13:29:56<br>2  toolbar?<br>3  A.  Yes.<br>4       MR. ACOSTA:  Objection.  Form.<br>5       THE WITNESS:  Which is -- again, I'm going to   13:30:04<br>6  refer you back to the same sentence, which is to use a<br>7  secure storage that -- within the toolbar that's not<br>8  an -- not an e-wallet.<br>9  BY MR. MARTON:<br>10  Q.  What would the secure storage in the toolbar be   13:30:16<br>11  that is not an e-wallet?  Give me an --<br>12  A.  Well, for example, a secure portion of the RAM of<br>13  the toolbar.<br>14  Q.  And what is a secure portion of RAM?<br>15  A.  Well, we talked about that.  Basically, RAM is   13:30:39<br>16  just memory.  And in the memory you store information.<br>17  And to the extent you store it in a publicly -- in a<br>18  place where everybody knows it's stored, and it's not<br>19  encryption -- not encrypted, then it's obviously not<br>20  secure.                                      13:31:03<br>21      That was the $100 coin laying on a public beach.<br>22      But, you know, RAM is massive.  And if you put<br>23  something somewhere that no one knows, you know, where<br>24  it is, and you don't keep it there very long, then<br>25  that's -- that's another way of securing.    13:31:22<br>Page 62 | 1      But, you know, it -- the reason it says one method   13:32:56<br>2  of secure storage is an e-wallet isn't all ways of<br>3  securing data within a storage device like a RAM.<br>4      I just gave you the RAM as an example.<br>5  Q.  So the RAM is -- is the RAM not an e-wallet?   13:33:16<br>6       MR. ACOSTA:  Objection --<br>7  (Cross talk.)<br>8       THE WITNESS:  I think we've covered this<br>9  extensively.  And I'm not sure -- I mean, your question<br>10  doesn't even make sense.  This is where I -- I said   13:33:27<br>11  earlier that, you know, RAM is a semiconductor device,<br>12  that, while operable, allows for storage when<br>13  interfacing with, you know -- as part of a software<br>14  program like the toolbar.  You know, it's a toolbar,<br>15  would get allocated RAM; and...             13:33:45<br>16      You know, so your question of whether RAM -- you<br>17  know, out of context, in this hypothetical we've been<br>18  working on for like a half hour, because the claims<br>19  don't actually even talk about RAM... It just doesn't<br>20  make sense.  Your question doesn't make sense.   13:34:08<br>21  BY MR. MARTON:<br>22  Q.  Does the patent, the '122 Patent, describe<br>23  securely storing account information in RAM?<br>24  A.  I don't recall exactly what it says; but it<br>25  provides examples like a toolbar and the e-wallet,   13:34:25<br>Page 64 |
| 1      And then we didn't talk about this example, but,   13:31:25<br>2  you know, if you think about all these beaches in the<br>3  world as -- as RAM, you, you know, could take an added<br>4  step of -- of, you know, putting -- putting that $100<br>5  coin in a -- in a vault that's somehow cemented to the   13:31:43<br>6  sand.  And then that -- you know, that would be secure<br>7  there on the sand.<br>8  BY MR. MARTON:<br>9  Q.  I --<br>10  A.  -- it was on a public -- on a public beach.   13:32:00<br>11  Q.  Okay.<br>12       MR. ACOSTA:  Is now a good time for a --<br>13       MR. MARTON:  One more minute.  One more<br>14  minute.<br>15  Q.  So you're saying that RAM associated with the   13:32:15<br>16  browser toolbar is another example of secure storage,<br>17  or could be another example of secure storage, that is<br>18  different from the e-wallet secure storage.  Is that<br>19  correct?<br>20  A.  Not the way you asked the question.   13:32:34<br>21      E-wallet, as you noted, is described in a certain<br>22  way.  You know, it means something to someone; a person<br>23  of ordinary skill in the art.<br>24      And secure storage is something also that means<br>25  something that -- something.              13:32:52<br>Page 63 | 1  where one of ordinary skill in the art would understand   13:34:30<br>2  that, you know, an implementation of that on a computer<br>3  would -- would involve RAM.<br>4  Q.  Okay.  If account information is stored in RAM,<br>5  but it is not secure from viruses, Trojan horses, or   13:34:53<br>6  computer hackers, is that considered securely stored?<br>7  A.  I'd need to look at that in context.<br>8  Q.  So it might, but it might not be?<br>9  A.  Depends on the context.<br>10       MR. ACOSTA:  Objection.  Form.          13:35:14<br>11       THE WITNESS:  If you're talking about in the<br>12  context of the claims, then we'd have to look at the<br>13  rest of the claim language and its notations.<br>14  BY MR. MARTON:<br>15  Q.  Okay.  I'm -- I'm talking about with respect to   13:35:21<br>16  the claims.  So Claim 1 of the '122 Patent -- if<br>17  account information is stored in RAM, but it is exposed<br>18  to a virus, is it securely stored?<br>19       MR. ACOSTA:  Objection.  Form.<br>20       THE WITNESS:  Your hypothetical is -- is --   13:35:40<br>21  ill-defined.<br>22  BY MR. MARTON:<br>23  Q.  In -- in what way?<br>24  A.  In -- in almost every way.<br>25  Q.  All right.  Let me start over.  How about this?   13:35:48<br>Page 65 |

```
 1  We have limited time.                        13:35:49
 2  A.  The virus doesn't mean -- I mean, I can give you a
 3  long list of why it's ill-defined, but I'm trying to be
 4  helpful here.
 5  Q.  Hold on.                                 13:35:57
 6      So we can agree that Claim 1 of the '122 Patent
 7  requires securely storing account information at the
 8  browser toolbar.
 9  A.  That is one of the limitations.  Yes.
10  Q.  If account information is received and decrypted   13:36:14
11  by the toolbar, and it is stored in -- on disk on the
12  client's computer, and it is in RAM for processing, but
13  it is exposed to a virus on the client's computer, has
14  that data been securely stored --
15          MR. ACOSTA:  Objection.  Form.        13:36:53
16  BY MR. MARTON:
17  Q.  -- as required by Claim 1 of the '122 Patent?
18          MR. ACOSTA:  Same objection.
19          THE WITNESS:  Your hypothetical is -- is,
20  again, way ill-defined.                       13:37:03
21      I mean, the fact that it's -- it's securely stored
22  in the browser toolbar begs the question as to how it
23  would be exposed to the virus.  If the virus on -- is
24  outside of the toolbar, then, you know, then it would
25  be secure.                                    13:37:26
                                                      Page 66
```

```
 1      So I -- I'm not -- your question's ill-defined.  13:37:28
 2  BY MR. MARTON:
 3  Q.  I think you must not be hearing what I'm saying.
 4  And the question is this.
 5      So the accused system is a process.  So there's   13:37:37
 6  the accused process.
 7      Data is received by the browser toolbar.  It is
 8  decrypted.  It is stored on disk at the client
 9  computer.  And it is in RAM for processing, and use by
10  the browser toolbar.                          13:37:58
11      But there is a virus on the client's computer, and
12  that virus has access to both the account data at the
13  disk and at RAM.
14      My question is:  Has that account data been
15  securely stored at the browser toolbar, as required by   13:38:17
16  Claim 1 of the '122 Patent?
17          MR. ACOSTA:  Objection.  Form.
18          THE WITNESS:  I haven't looked at the accused
19  system and have no -- no opinion on that.
20  BY MR. MARTON:                                13:38:32
21  Q.  I'm not talking about the accused system.  I'm
22  giving you a hypothetical.
23  A.  Your question started with:  the accused system.
24  Q.  I don't believe it did.
25  (Cross talk.)                                 13:38:46
                                                      Page 67
```

```
 1      But regardless -- I'm not saying the accused   13:38:47
 2  system.  I'm not saying the accused system.  I'm not
 3  talking about Zoho technology.
 4      This is a hypothetical.  There is a browser
 5  toolbar on a client computer.  It receives encrypted   13:38:57
 6  account data.  It is decrypted.  It is stored on disk
 7  of the client computer.  That account data in decrypted
 8  form is in RAM for processing and use by the browser
 9  toolbar.
10      There happens to be a virus on the client   13:39:12
11  computer.  That virus has access to the account data in
12  its decrypted form on disk and as it exists in RAM.
13      And my question to you is:  In that scenario, has
14  the account data in that process been securely stored
15  as required by the second-to-last element of Claim 1 of   13:39:36
16  the '122 Patent?
17          MR. ACOSTA:  Objection.  Form.  Objection.
18  Scope.
19          THE WITNESS:  I would need to look at that --
20  that system.                                  13:39:47
21  BY MR. MARTON:
22  Q.  So it may have been securely stored.  Is that what
23  you're telling me?
24          MR. ACOSTA:  Objection.  Form.  Objection.
25  Scope.                                        13:39:57
                                                      Page 68
```

```
 1          THE WITNESS:  Yeah.  I think that you're   13:39:57
 2  hypothetical's ill-defined, so I would like to actually
 3  look at a system if I was going to opine on whether or
 4  not it meant that element --
 5          MR. MARTON:  Okay.                    13:40:07
 6          THE WITNESS:  But the patent describes
 7  several examples.  We've gone over those.  A person of
 8  ordinary skill in the art would know how to -- how to
 9  securely store.  So I'm not sure what -- what else I
10  can say.                                      13:40:22
11          MR. MARTON:  Okay.  We can take a break.
12          MR. ACOSTA:  Okay.
13          THE VIDEOGRAPHER:  Okay.  The time is now
14  1:40 p.m.  This marks the end of Media Number 2.  And
15  we are off the record.                        13:40:35
16  (Recess taken from 1:40 p.m. until 1:53 p.m.)
17          THE VIDEOGRAPHER:  Okay.  The time is now
18  1:53 p.m.  This marks the beginning of Media Number 3,
19  and we are back on the record.
20  BY MR. MARTON:                                13:52:59
21  Q.  Welcome back, Dr. Meléndez.
22  A.  Thank you.
23  Q.  Did you speak with your counsel during the break?
24  A.  Yes.
25  Q.  Did you speak about your testimony?       13:53:06
                                                      Page 69
```

18 (Pages 66 - 69)

## Page 70

1  A.  No.                                           13:53:08
2  Q.  Okay.  So before the break we were talking about
3  examples in the '122 Patent specification of securely
4  storing account information at the browser toolbar.
5      Do you remember that?                         13:53:33
6  A.  I remember we had a discussion about -- related to
7  that, yes.
8  Q.  And I was asking you to enumerate and describe
9  each of the examples of securely storing the account
10 information at the browser toolbar, as described in the   13:53:48
11 specification.  Right?
12 A.  I don't recall that.
13     I think that you had asked me to highlight the
14 ones I had commented on in my report.
15 Q.  Well, I do want to know all of the examples of    13:54:07
16 securely storing account information at the browser
17 toolbar described in the '122 Patent from your
18 perspective.  I'd like --
19 A.  That's not -- that's not an analysis that I did;
20 nor did I need to do for the opinions in my report.  13:54:29
21 Q.  Okay.  Well, let's talk about the ones first
22 enumerated in your report.  Is that okay?
23 A.  Sure.
24 Q.  So the first one that we talked about before the
25 break, I think you identified in paragraph 33 of your  13:54:45

## Page 71

1  declaration.  Is that correct?                      13:54:49
2  A.  I think that's -- I don't -- I don't remember
3  which one we talked about first, but that does sound
4  familiar that there was one on 33.  Do you want me to
5  go to 33?                                           13:55:04
6  Q.  Please.  So in paragraph 33, you said one example
7  of securely storing from the Asserted Patents is
8  limiting the amount of time the information is
9  maintained.  Is that correct?
10 A.  That is an example of -- of securely storing.    13:55:36
11     I do not think I referenced this Claim 6 and 16,
12 where that, I understand, is identified as a
13 additional -- sorry -- dependent limitation of -- in
14 the '901; and then Claim 3, it says here, of the '088.
15 Q.  So if account information is stored only for a   13:56:08
16 limited amount of time at the browser toolbar, then it
17 has been securely stored according to the requirements
18 of the '122 Claim 1.  Is that correct?
19 A.  I'm not sure.  That's not an analysis I -- I did.
20     That is one method of securely storing, but      13:56:39
21 obviously you'd have to look at the rest of the... of
22 the system.
23 Q.  What else would you need to look at?
24 A.  Well, for example, in that, you know, if I put
25 that coin on that remote beach, and I only leave it  13:57:03

## Page 72

1  there for five minutes, but there's someone standing  13:57:08
2  right next to me when I leave it there, then, you know,
3  then that -- you know, the time wouldn't have been a
4  factor.
5      So you have to look at the system to see, you    13:57:22
6  know, whether or not there's a reasonable likelihood
7  that -- that it would be discovered in that time frame.
8  Q.  So in your coin example, which I actually like, if
9  you were to put your coin under a rock for only
10 five minutes, that would be securely storing if nobody  13:57:46
11 else was around.  Is that right?
12 A.  If no one else was around, you could actually not
13 even have to put it under the rock, and it would still
14 be securely storing.
15 Q.  Okay.                                           13:58:07
16 A.  And --
17 Q.  But if someone was standing next to the rock and
18 watching you, if you put the coin under the rock, and
19 your plan was to leave it there for only five minutes,
20 it wouldn't be securely storing, because the person was  13:58:23
21 watching you do it, and they could immediately grab it.
22     Is that correct?
23 A.  Yeah.  Well, again, this analogy is not meant to
24 be gone too far.  Right?
25     I -- I might have that person that's watching me  13:58:39

## Page 73

1  do it be a security guard or a police officer; in which  13:58:42
2  case it would still be secure.  But, you know, assuming
3  that was someone that saw me do it, and, you know, had
4  a bad intent, they could -- they could take it.
5  Q.  So then --                                      13:59:03
6  A.  It doesn't mean necessarily that it's not secure,
7  I guess, but...
8  Q.  Let's assume the person does have bad intent, and
9  they like to pick up other people's money when they get
10 the chance, and they are watching you walk up to the  13:59:19
11 rock, and you place your coin under the rock.
12     And your plan is just to leave it there for five
13 minutes.  And then you turn around and walk away, with
14 the intent of coming back in five minutes.
15     Have you securely stored your coin?             13:59:34
16 A.  I guess I -- yes, for -- for some period of time.
17     I guess in that analogy, it's -- it's not
18 something I -- I've thought about.
19 Q.  When you say for some period of time, you have
20 securely stored it for some period of time -- what    14:00:04
21 period of time would that be?
22 A.  Well, at least in this -- the hypothetical of --
23 of coins on sand beaches, which has nothing to do, by
24 the way, with the patents or this limitation, it would
25 be at least secure while I was -- while I was there,  14:00:21

| | |
|---|---|
| 1  unless the person was strong enough to bulldoze me    14:00:24 | 1  this coin.                                14:04:10 |
| 2  over, and -- and go, which they probably could do | 2  Q.  So by placing it under the rock, you did not |
| 3  that -- most people, I guess. | 3  securely store the coin in this hypothetical.  Is that |
| 4  Q.  So it has been securely stored, according to you, | 4  what you're telling me? |
| 5  as long as you're there, and you could keep the --   14:00:47 | 5       MR. ACOSTA:  Objection to form.        14:04:20 |
| 6  A.  Well, in this -- yeah, in this analogy which has | 6       THE WITNESS:  No.  I'm -- I'm not even sure |
| 7  not lost its relevancy way beyond what it was mentioned | 7  what the hypothetical is anymore; and the hypothetical |
| 8  for, you know, assuming I am strong enough to defend | 8  is not related to the claim. |
| 9  it, or the person there is a security guard and, you | 9       I brought up the analogy very specifically to talk |
| 10 know, was hired to defend it, then obviously it would   14:01:07 | 10 about where you put something, you know, in something   14:04:29 |
| 11 be practically reasonably secure while it was there. | 11 that's vast, like RAM. |
| 12      That not being the case, at least for the time | 12      And a person of ordinary skill in the art in the |
| 13 period in which those elements were there, it's hard to | 13 technology domain would understand what it means to |
| 14 say. | 14 securely store something.  And the elements that we've |
| 15      And, again, this is just an analogy about sand; it   14:01:36 | 15 described are, you know, location as examples; amount   14:04:53 |
| 16 has nothing to do with the patent claims. | 16 of time of exposure as another example; an additional |
| 17 Q.  Right.  I actually like the analogy.  It's your | 17 level of security at the location. |
| 18 analogy, but it's a pretty good one, because it's easy | 18      And in the analogy there of the sand, you know, |
| 19 for us nontechnical folks to -- to get a better | 19 those were just, okay, here's a -- here's a beach |
| 20 understanding of what it is you're talking about    14:01:50 | 20 that's -- that's somewhere where no one's not really   14:05:18 |
| 21 through this analogy. | 21 around, and the beach -- beach is vast, so if it's only |
| 22      In -- in this situation, the person standing next | 22 there for a little bit of time, then it's -- it's |
| 23 to the rock is not a security guard.  It's not a police | 23 secure.  That's one way of securing something. |
| 24 officer.  It's someone with bad intent who wants your | 24      And then we talked about a vault, you know, under |
| 25 money, who is able to overtake you physically.  And you   14:02:07 | 25 the rock, a heavy vault.  So if I put that coin under   14:05:34 |
| Page 74 | Page 76 |
| 1  walk up, and you put your coin under the rock while   14:02:16 | 1  the rock, and there happened to be a heavy vault under   14:05:39 |
| 2  that person is watching you. | 2  there, and I dropped it in there and closed it up and |
| 3       Have you securely stored your coin? | 3  put the rock back down, you know, then obviously that's |
| 4  A.  Again, it -- in the analogy, it kind of breaks | 4  a different securely storing. |
| 5  down, because we don't really know what's going on    14:02:26 | 5       You know, these aren't -- you know, these are    14:05:58 |
| 6  under that rock, and we don't know the other parameters | 6  things related to a physical object. |
| 7  of the system. | 7       But the patent, I remember, gave a few examples |
| 8       We know there's at least knowledge; you know, | 8  that, you know, are consistent with what a person of |
| 9  knowledge that something's there.  But that doesn't | 9  ordinary skill in the art would understand.  And I |
| 10 necessarily mean that this person in this example has   14:02:46 | 10 identified two or three of those; maybe even four --   14:06:19 |
| 11 either the access or the capability to -- you know, to | 11 I'm not sure but... |
| 12 remove that coin. | 12 BY MR. MARTON: |
| 13 Q.  If the person has access and capability to remove | 13 Q.  Can you tell me every example of securely storing |
| 14 the coin immediately upon your placing it under there, | 14 that you've identified from the patent? |
| 15 have you securely stored that coin?           14:03:12 | 15 A.  I can at least go through my report and identify   14:06:33 |
| 16 A.  I would say in this example, if the person doesn't | 16 the others.  We've talked about three already. |
| 17 care at all whether I'm there or not, they have | 17 Q.  Okay.  Can you list out those three for me again? |
| 18 ill-intent, they want to take the coin, then, you know, | 18 A.  The ones that we've talked about already had to do |
| 19 they could just bowl me over and take it out of my | 19 with time limitation.  You know, that's related to |
| 20 hand, or they can wait till I put it under a rock or   14:03:39 | 20 exposing something, but -- you know, for -- and it's   14:06:51 |
| 21 wait until I leave or not wait until I leave. | 21 not so much time as just, you know, not leaving it |
| 22      But I guess it's sort of -- that's sort of | 22 there.  So that translates into a time. |
| 23 irrelevant, because I didn't, obviously, provide a | 23      And I think the limitation of one of the claims |
| 24 sustained protection for my coin.  I should have just | 24 said about after the transaction was completed.  I |
| 25 not -- not shown up at all to the beach and -- with    14:04:05 | 25 think you mentioned that.                  14:07:13 |
| Page 75 | Page 77 |

```
 1      The other is a secure storage; specifically an    14:07:15
 2   e-wallet.
 3      And then generally, any secure storage that would
 4   be within the toolbar, because the limitation requires
 5   at the toolbar.  So there would be some, at least some    14:07:40
 6   storage of the toolbar involved with that.
 7      And then really, you know, anywhere it could be
 8   securely stored that it's accessible to the toolbar.
 9   Q.  So is that a fourth example?
10   A.  Well, let me -- I have to if you want me to    14:08:04
11   identify the ones from my report, I'd have to --
12   Q.  Yeah, that would be fine.
13   A.  -- actually read it because --
14   (Cross talk.)
15   BY MR. MARTON:    14:08:08
16   Q.  Feel free to look at your report and -- feel free
17   to look at your report and tell me.  So far it sounds
18   like you've given me three examples; but if there's
19   more, please let me know.
20   A.  Yeah.  Again, my report wasn't to identify all the    14:08:20
21   examples.  It was just to -- to make it clear why it
22   wasn't indefinite.
23   Q.  Mm-hm.
24   A.  My Exhibit Share thing keeps scrolling to
25   different sections, so it's taking a little longer    14:10:14
```
Page 78

```
 1   here.    14:10:18
 2      In this -- as I go along here, in paragraph 28, I
 3   talk about that the specification talks about the
 4   e-wallet being both inside as well as outside of the
 5   browser toolbar.    14:12:06
 6      And then in paragraph 27, it talks about what you
 7   had mentioned before regarding the RAM; and by storing
 8   it specifically within the -- the browser toolbar,
 9   you're keeping it away from other parts of the RAM that
10   are used by other programs.  So that's also    14:12:30
11   obviously -- provides securely storing.
12      In paragraph 29, it talks about the statement from
13   the Patent Office itself regarding that the -- that the
14   toolbar -- that the e-wallet can be part of the browser
15   toolbar.    14:13:01
16      Are you all still there?  Because I usually don't
17   talk this much without someone interrupting me.
18   Q.  I'm still here.
19   A.  Okay.  Good.  Sorry.
20   Q.  I'm just letting you --    14:13:13
21      THE WITNESS:  I'm not sure what's happening
22   with this Exhibit Share, but I'm reading the paragraph
23   and then not touching anything, and after a little bit,
24   it like bumps me up --
25
```
Page 79

```
 1   BY MR. MARTON:    14:13:25
 2   Q.  Hm.  That's bizarre.  That doesn't happen to me.
 3   A.  -- the page.
 4   Q.  Okay.  Other than the examples you've just
 5   identified of what you contend the '122 describes as    14:13:32
 6   securely storing account information at the browser
 7   toolbar, can you identify any other examples of
 8   securely storing account information at the browser
 9   toolbar from the patent?
10      MR. ACOSTA:  Objection.  Form.    14:13:58
11      THE WITNESS:  It looks like there's an
12   additional related reference in paragraph 30 to the
13   Office Action that discusses the maintaining of the
14   encryption key by the browser toolbar.
15   BY MR. MARTON:    14:15:15
16   Q.  How is maintaining the encryption key by the
17   browser toolbar an example of securely storing account
18   information at the browser toolbar?
19   A.  Well, it limits the availability of the encryption
20   key because it's maintained by the browser toolbar.    14:15:26
21   Q.  Yeah.  But in Claim 1 of the '122 patent, the data
22   is then -- is decrypted using that encryption key that
23   is maintained by the browser toolbar, and then it's
24   securely stored.
25      So my question is:  How is it securely stored    14:15:43
```
Page 80

```
 1   after it's decrypted by the -- by that --    14:15:46
 2   A.  Well, none of my statements here related to
 3   whether or not the claim is performed.  Right?
 4      We're just looking at this.  You were asking me is
 5   securely storing something that's described in the    14:16:01
 6   patent.
 7      That's not an analysis I did extensively because I
 8   was -- I was just working on claim construction of --
 9   Q.  Okay.
10   A.  -- arguing that this term is not indefinite.    14:16:15
11      But I gave you some examples from my report.  And
12   then you asked me for all of them.  So now I'm going
13   through my report to identify additional disclosures
14   that I provided as examples.
15   Q.  Okay.  Can you look at paragraph 32 of your    14:16:35
16   declaration?
17   A.  Sure.
18   Q.  In this, you say:  "A POSITA, in the context of
19   the specifications and the claims of the Asserted
20   Patents, would understand that" -- quote -- "securely    14:16:49
21   storing the account information' at the browser toolbar
22   means that the account information is downloaded to the
23   browser toolbar securely, where it has restricted
24   availability at the customer's computer generally, or
25   otherwise include any measure taken to limit access to    14:17:08
```
Page 81

21 (Pages 78 - 81)

```
 1  A.  I think I've already given you an example of -- of   14:24:01
 2  one, you know, suggested improvement, if this was going
 3  to be attacked.
 4      But, again, this wasn't offered nor intended as
 5  a -- as a construction.                                  14:24:14
 6  Q.  If --
 7  A.  I think there is an alternative construction that
 8  I actually did opine on.
 9  Q.  We'll get to that.
10      If some measure, any measure, is taken to limit     14:24:25
11  unauthorized access to the account information, would
12  that be enough to qualify as securely storing?
13  A.  I think it -- it would need to be any effort that,
14  you know, would be reasonably understood by a person of
15  ordinary skill in the art.                              14:24:53
16      I mean, you know, securing data -- that step,
17  alone, absent, you know, at the toolbar, which is what
18  you've been focused on, is something that's been going
19  on for -- for decades; and, you know, Dr. Jakobsson
20  commented on that in his report.                        14:25:13
21      So a person of ordinary skill in the art would
22  certainly know how to -- you know, reasonably what it
23  means to secure -- to secure data.  And so any -- I
24  would say -- I guess I would qualify it.  You know,
25  any -- maybe any measure taken to limit unauthorized   14:25:31
                                                        Page 86
```

```
 1  access to the data, as would be known by a person of   14:25:36
 2  ordinary skill in the art.
 3      Well, actually, I -- I think I already kind of put
 4  that at the beginning of the sentence.
 5  Q.  Okay.  Can you --                                   14:25:50
 6  A.  But, actually, the patent has two others that I
 7  see.  You skipped paragraph 31.
 8  Q.  What other one?
 9  A.  Data could -- could be stored -- securely stored
10  in a secure database or in a secure datastore.  Those  14:26:07
11  are also not only disclosed in the patent; but they're
12  also used in -- in the same -- in a -- some of the
13  claims.
14  Q.  Would storing in a secure database be storing at
15  the browser toolbar?                                    14:26:31
16  A.  Yeah.  Well, I mean, if your database is within
17  the browser toolbar, for sure.
18      That would be an alternative specific example of
19  the secure storage at the browser toolbar, where one --
20  one specific example was the e-wallet.  And here       14:26:49
21  another example is the database.  And then another
22  example is the datastore.  You can obviously have a
23  database in RAM that's -- I'm sure you knew that
24  already.  But a person of ordinary skill in the art
25  would understand that.                                 14:27:10
                                                        Page 87
```

```
 1  Q.  Another question.  So are there steps you can take  14:27:12
 2  that limit access to the account information once it's
 3  downloaded to the browser toolbar that are not
 4  sufficient to make the data deemed securely stored?
 5  A.  I'm not sure I understand your question, or maybe   14:27:33
 6  I don't have an opinion on it.
 7  Q.  Well, my question is:  Are there steps that
 8  someone can take to limit access to account data during
 9  the storing process at the browser toolbar that are
10  insufficient to render the act of storing as secure?    14:27:57
11      MR. ACOSTA:  Objection.  Form.
12      THE WITNESS:  I think I already actually
13  gave -- answered that question; or maybe I gave you the
14  information.
15      Which is why I think the -- you know, person of     14:28:21
16  ordinary skill in the art wouldn't need to go down that
17  rabbit hole; but, you know, the reason I said "limit
18  to" -- you know, "unauthorized access" is obviously you
19  could limit the access to authorized persons, but not
20  to unauthorized persons, so...                          14:28:36
21      But that's not a reasonable, you know,
22  interpretation of the securely storing limitation,
23  so...
24  BY MR. MARTON:
25  Q.  Can you give me another example?                    14:28:49
                                                        Page 88
```

```
 1  A.  Not off the top of my head.  It's not something    14:28:52
 2  that -- that I looked at.
 3  Q.  Does storing account information in unencrypted
 4  form on a computer disk constitute secure storage, as
 5  required by Claim 1 of the '122 Patent?                 14:29:15
 6      MR. ACOSTA:  Objection.
 7      THE WITNESS:  Again, you're -- yeah.  You're
 8  using this word "constitute."  I feel like I've
 9  answered this question before.  It depends.
10  BY MR. MARTON:                                          14:29:30
11  Q.  Depends on what?
12  A.  On the rest of the system.  I'd have to look at
13  the system.
14  Q.  And what would you have to look at?
15  A.  I would have to --                                  14:29:39
16      MR. ACOSTA:  Objection.
17      THE WITNESS:  -- look at its implementation,
18  and see what access there was that was provided
19  generally.
20  BY MR. MARTON:                                          14:29:52
21  Q.  What do you mean, "what access was provided
22  generally"?
23  A.  Yeah.  Well, okay.  So this is getting into pretty
24  kind of basics about computers, I guess.
25      But computers have information.  They do           14:30:10
                                                        Page 89
```

23 (Pages 86 - 89)

```
 1  A.  Sensitive data.                              14:47:20
 2      And then you would look to see if there's some,
 3  you know, method that a POSITA would understand is, you
 4  know, cryptographically, maybe specifically with
 5  encryption, maybe with storage locations, maybe with    14:47:32
 6  randomization of storage locations; but a myriad of
 7  ways that a POSITA would understand are ways of
 8  securing information when you store it.
 9      Some of these are disclosed in the claims like the
10  secure database, the secure datastore.              14:47:50
11      Some are disclosed within our discussion earlier
12  of the e-wallet -- which the e-wallet itself can be
13  implemented and secured in different ways.
14      So these are the ways that -- that a POSITA would
15  understand.                                         14:48:05
16      And so if you were looking whether or not the
17  limitations met, you -- you have to look at the system
18  to see if really if there's a cryptographic or
19  methodology that's being used, or some other method of
20  securing the data in these -- you know, that a person  14:48:21
21  of ordinary skill in the art would -- would understand.
22  Q.  Okay.  So as a first step, or as a step, a POSITA
23  would look to see what efforts have been taken to
24  restrict unauthorized access to the data that is being
25  stored to the account -- and stored to the browser    14:48:44
                                                      Page 102
```

```
 1  toolbar.  Is that right?                            14:48:47
 2  A.  Well, that's one -- one way.
 3      We talked about access -- knowledge, access, and
 4  capability.
 5      You know, those are, in my view, sort of the --   14:49:00
 6  the fundamental three things that you look at.
 7      And, you know, you obviously -- obviously you can
 8  have combinations of those things.
 9  Q.  What do you mean by "knowledge, access, and
10  capability"?                                         14:49:18
11  A.  I talked about that already.
12      You know, knowledge of where something is.  If you
13  don't know where it is, then you, you know, can't
14  reasonably get to it.
15      Access:  The ability to -- to get to wherever it   14:49:30
16  is.
17      And then we talked about capability; even if you
18  knew where it was and could get to it, you know, can
19  you actually grab it?
20  Q.  So the knowledge, access, and capability is from   14:49:48
21  the perspective of -- of the rogue program.  What
22  knowledge does the rogue program have of where the data
23  is?  What access does the rogue program have to the
24  data?  And what capability does the rogue program have
25  to get the data?                                     14:50:03
                                                      Page 103
```

```
 1      Is that what you're talking about?              14:50:04
 2  A.  No.
 3      MR. ACOSTA:  Objection.
 4      THE WITNESS:  The -- the rogue program is
 5  just one example that was given in the background      14:50:10
 6  section.
 7      You're assuming there's a rogue program, and, for
 8  example, it's not, you know, like in those movies you
 9  see.  Hey, you got, you know, five minutes' access to
10  this terminal.  Here's a USB.  And you see this person  14:50:25
11  typing away at the terminal, you know, trying to break
12  in; trying to break in.
13      So that's a person that's actually at a keyboard
14  that's doing something.
15      You know, I wouldn't -- I wouldn't take this rogue  14:50:39
16  program, and, you know, as -- that's disclosed as an
17  example, and read it in -- into the claim limitation as
18  the -- you know, as the only embodiment.
19  BY MR. MARTON:
20  Q.  Look, I'm just trying to understand what it is we  14:50:57
21  need to evaluate to determine if something is securely
22  stored.
23      And it sounds to me like you're, at one point,
24  looking at efforts taken by the system to restrict
25  access, whether it's encrypting the data or storing to  14:51:19
                                                      Page 104
```

```
 1  a unknown -- a storage location that unauthorized folks  14:51:22
 2  would not be aware of, or storing to secure storage;
 3  and that --
 4      So you evaluate what efforts have been taken to
 5  restrict the access, on the one hand; and then on the   14:51:35
 6  other hand, you have to evaluate the efficacy of those
 7  efforts against expected or reasonably expected
 8  threats.  Is that -- is that correct?  Is that the
 9  analysis we're doing?  Because I'm just trying to put
10  parameters around it.  I just want to understand it.   14:51:54
11  A.  Sure.
12      MR. ACOSTA:  Objection.  Form.
13      THE WITNESS:  No, I can -- I can help you
14  with that.  I think, first off, if you step back,
15  you're making this way too hard.  Like, the claim       14:52:02
16  limitation is not perfectly securing the storage.  It's
17  just securely storing.
18      And a person of ordinary skill in the art
19  understands that, by and large, there are a myriad
20  of -- of -- of ways of securing data.  It's not rocket  14:52:16
21  science to someone who's a person of ordinary skill in
22  the art.
23      And, you know, and the first thing I would look at
24  is:  Is there any cryptographically, you know,
25  recognized way that's being used?                      14:52:32
                                                      Page 105
```

**Page 110**

    1    That account information has some other           14:57:52
    2  limitations associated with it.  And it's being done at
    3  the browser -- at the browser toolbar, which, again,
    4  provides a lot of value, in terms of -- of limiting,
    5  you know, the accessibility of that information to the   14:58:11
    6  general computing system, as well as just practical
    7  value, which I'm not sure is part of the limitation of
    8  the claim, but related to its persistence, because it
    9  can be stored there and/or accessible from there, even
   10  as you're, you know, changing the HTML of web -- web   14:58:31
   11  pages.
   12  BY MR. MARTON:
   13  Q.  Does storing account information in unencrypted
   14  form at the browser toolbar on a computer that is
   15  locked with a password, but not otherwise secured   14:58:45
   16  constitute secure storage, as required by Claim 1 of
   17  the '122 Patent?
   18  (Cross talk.)
   19        MR. ACOSTA:  Objection.  Form.  Objection.
   20  Scope.                                          14:58:57
   21        THE WITNESS:  Yeah.  I don't know.
   22     That's -- that's not something I've looked -- I've
   23  looked at, and would require me to do an analysis
   24  that's -- would look at things and -- and what system,
   25  and longer than what we have here today.       14:59:12

**Page 111**

    1  BY MR. MARTON:                                    14:59:18
    2  Q.  Does storing account information in unencrypted
    3  form at the browser toolbar on a computer that is
    4  locked with a password, but the password is written on
    5  a Post-it note stuck to the screen, constitute secure   14:59:27
    6  storage, as required by Claim 1 of the '122 Patent?
    7        MR. ACOSTA:  Objection.  Form.
    8        THE WITNESS:  Yeah, for one, the Claim 1,
    9  again, doesn't have secure storage as a limitation.
   10  It's securely storing account information.       14:59:42
   11     And that's not something I've looked at nor opined
   12  in my report, which is related to the claim
   13  construction.
   14  BY MR. MARTON:
   15  Q.  If -- let's assume we're storing account       15:00:05
   16  information, and it's being stored at the browser
   17  toolbar.  Okay?
   18     If some effort is met -- is made to restrict
   19  access to data in the course of storing the account
   20  information, does that constitute secure storage?   15:00:25
   21        MR. ACOSTA:  Objection.  Form.
   22        THE WITNESS:  I would -- I would need to look
   23  at the system.
   24     Again, I -- you know, I would expect that secure
   25  storing would be met by any one of -- no -- and, you   15:00:38

**Page 112**

    1  know, cryptographic types of methods; encryption being   15:00:43
    2  one of them.  It doesn't have to be encryption.
    3     You know, that would be known to a person of
    4  ordinary skill in the art.
    5  BY MR. MARTON:                                    15:00:55
    6  Q.  If you used one of the well-known methods of 2008
    7  for securely storing account information at the browser
    8  toolbar, but now it's 2023, and that method is now
    9  deemed pretty well known as insufficient, would one not
   10  be securely storing at this point?              15:01:25
   11  (Cross talk.)
   12        MR. ACOSTA:  Objection.  Form.
   13        THE WITNESS:  Yeah.  For one, I -- I didn't
   14  say that it was known to securely store account
   15  information at the browser toolbar.  That's something   15:01:37
   16  that you said.  I said that --
   17  BY MR. MARTON:
   18  Q.  I'm saying you're using one of the methods that is
   19  known for secure storage.  You've told me over and over
   20  again that there's a lot of methods known for securely   15:01:48
   21  storing, so we're focusing on the securely storing.
   22     I want to not focus on the account information or
   23  browser toolbar.  Let's assume that's there.  Those
   24  elements are met.
   25     So we're talking about securely storing.       15:01:59

**Page 113**

    1     And you're using one of the well-known methods   15:02:02
    2  from 2008 for securely storing, whether it's encryption
    3  or using some secure data storage.
    4     But that known method from 2008 is now ineffective
    5  in 2023.  If you use that method from 2008 now, in   15:02:15
    6  2023, are you securely storing the account information,
    7  as required by Claim 1 of the '122 Patent?
    8        MR. ACOSTA:  Objection.  Form.
    9        THE WITNESS:  I don't know what you mean
   10  by -- by ineffective.                            15:02:32
   11     You know, this -- again, the claim limitation
   12  doesn't say perfectly securing.
   13     You know, I think a person of ordinary skill in
   14  the art understands that there's no such thing as
   15  perfectly securing.                             15:02:49
   16     I mean, you can have keys -- even crypto -- you
   17  know, which people like to think is perfect -- you
   18  know, over time with fast enough computers, you know,
   19  quantum computers can crack, you know, codes.
   20     I -- you know, but, again, like limitations not   15:03:08
   21  perfectly securing or forever securing.
   22     I think to look at the limitation, it's a method
   23  that's being practiced, and you would look at the time
   24  that it's being practiced.
   25     You know, if it's securely storing at -- you know,   15:03:24

29 (Pages 110 - 113)

```
 1  the account information at the browser toolbar, and if   15:03:31
 2  it's not, then it's not practiced; and if it is, then
 3  it -- then it is.
 4      But I -- you know, somehow in his report,
 5  Dr. Jakobsson seemed to get distracted by whether or     15:03:41
 6  not something was perfectly secure; but, you know, the
 7  reality is that this limitation just, you know, says
 8  that it's securely storing.  So it's just, you know --
 9  BY MR. MARTON:
10  Q.  So if it need not --                                 15:03:56
11  A.  -- a POSITA would understand that to be reasonably
12  secure.
13  Q.  If it need not be perfectly stored -- strike that.
14      If it need not be perfectly secure, how do you
15  know if it is secure enough to be deemed securely        15:04:14
16  stored?
17          MR. ACOSTA:  Objection.
18          THE WITNESS:  Well, I know that because I'm a
19  person of ordinary skill in the art.  There's commonly
20  accepted methods and practices associated with securing  15:04:27
21  data.
22      You know, and Dr. Jakobsson's an expert in
23  encryption.  He knows other ways of securing data, you
24  know, but...
25
                                                    Page 114
```

```
 1  BY MR. MARTON:                                15:04:46
 2  Q.  Does the nature of the threat that a client
 3  computer is exposed to impact whether or not storing
 4  account information at the client's browser toolbar is
 5  done securely or not?                         15:05:06
 6          MR. ACOSTA:  Objection.  Form.
 7          THE WITNESS:  Yeah.  Again, you're -- you're
 8  just reading into this limitation something that's
 9  not -- that's not there.
10      A person of ordinary skill in the art would   15:05:19
11  understand the reasonable interpretation of securing
12  account information, absent the -- the toolbar part,
13  which you mentioned, to -- to just ignore it for a
14  little bit.
15      And they -- you know, what you would look for   15:05:34
16  is -- is, you know, are commonly methods being used
17  that secure data.
18  BY MR. MARTON:
19  Q.  So if you don't use one of the common methods to
20  secure data, is it not securely stored?          15:05:48
21  A.  No.
22      A person of ordinary skill in the art would
23  understand that securely storing -- again, you're going
24  down this rabbit hole again, because, you know, this is
25  something that -- that we understand.  You know it only  15:06:08
                                                    Page 115
```

```
 1  becomes complicated if you want to -- you know, if you   15:06:11
 2  want to try to make it complicated.
 3      It's -- you know, fundamentally you would look at,
 4  you know, if there's some proprietary approach to
 5  securing the data that would be -- I'd be curious what   15:06:22
 6  it could be.  It's not fundamental.
 7      But you would look at those pillars, you know,
 8  knowledge, access, and capability.
 9      And this is reasonable.  Right?
10      I mean, a -- you know, can a person of ordinary     15:06:40
11  skill in the art come up with some totally crazy way
12  that something's not secure?
13      Yeah.  Probably.  But that's not what the metric
14  is, in terms of deciding whether a term is definite or
15  not.                                                    15:06:53
16      You know, a reasonable interpretation of this term
17  says that securely storing isn't rocket science and
18  just look to see if the storing is securely.
19  Q.  Okay.  Does what is deemed a reasonable method for
20  securely storing change over time?                      15:07:11
21          MR. ACOSTA:  Objection.  Form.  Objection.
22  Scope.
23          THE WITNESS:  I figured if -- if a tree falls
24  in a -- forest, does it make a sound?
25      I -- I don't know.  That's not something I've --    15:07:33
                                                    Page 116
```

```
 1  I've thought about.                                     15:07:36
 2      I mean, look, you know, cryptography's been around
 3  for a long time.  We're still using symmetric
 4  encryption.  It was invented hundreds of years ago; you
 5  know, asymmetric -- at least, you know, 40, 50 years    15:07:47
 6  ago.
 7      I mean, the things that people do to store things
 8  are -- are pretty fundamental if you want to store
 9  securely.
10      And when you look at those, you -- you look at     15:07:59
11  those, you know, pillars of knowledge, access, and
12  capability.
13      Obviously, if you don't have an encryption key,
14  you don't have the capability, even if you know where
15  it is and you intercept the message.  Right?           15:08:11
16      So you have knowledge of where it is.  You have
17  access to at least grab those -- those signals, but you
18  don't have the capability to crypt it.
19      You know, if -- if I want to sit here and have a
20  few beers and think about, like, crazy things -- first, 15:08:32
21  I would have to drink, which I'm not doing.  But I
22  guess I -- you know, I could come up with things.
23      But it's not -- you know, my understanding of the
24  metric -- maybe I'm understanding incorrectly -- is
25  that, you know, this is a person of ordinary skill in  15:08:46
                                                    Page 117
```

30 (Pages 114 - 117)

```
 1  the art, you know, reasonably understanding the scope.    15:08:48
 2      And I don't -- I don't think there's any question
 3  here, you know.  A secure database -- that's one of the
 4  terms in the claims.  That wasn't questioned.
 5      You know, secure datastore -- that was one of the    15:09:01
 6  terms in the claim; not questioned.
 7      Secure -- securely storing -- you know, it's
 8  another secure term.  It doesn't say "perfectly."
 9  Doesn't say "for all time."
10      You know, my understanding is, you know:  Would a    15:09:15
11  person of ordinary skill in the art understand that
12  securely storing had been done?
13  BY MR. MARTON:
14  Q.  All right.  So let's talk about securely storing.
15      Setting aside the account information and the browser    15:09:27
16  toolbar, we're talking about a public computer, a
17  library computer, a computer at the public library.
18  Right?
19      So does storing encrypted account information on
20  that computer, where the information can be decrypted    15:09:44
21  by a three-ASCII-character password constitute secure
22  storage, as required by Claim 1 of the '122 Patent?
23          MR. ACOSTA:  Objection.  Form.  Objection.
24  Scope.
25          THE WITNESS:  I haven't done that analysis,    15:10:02
                                                          Page 118
```

```
 1  and, frankly, I haven't gone to a public library in    15:10:03
 2  maybe a decade, so I -- I don't know what -- you know,
 3  what that adds or takes away from a system.
 4  BY MR. MARTON:
 5  Q.  Okay.  So on my computer -- I'm at a café.  I have    15:10:13
 6  no -- my computer is not locked.  There's no password
 7  access.  Just my computer is at the café.
 8      Anyone who picks it up can log into it, open it,
 9  and look at whatever's on there.
10      Let's say, I store encrypted account information    15:10:33
11  on that computer.  And the information can be decrypted
12  via three-ASCII-character password.
13      Does that constitute secure storage of -- of the
14  account information?
15          MR. ACOSTA:  Objection.  Form.  Objection.    15:10:51
16  Scope.
17          THE WITNESS:  That's not an analysis I -- I
18  did.  And I certainly don't have enough information
19  regarding all of the system attributes I'd need to --
20  to do that analysis.                                  15:11:03
21  BY MR. MARTON:
22  Q.  So it may, or it may not be?
23  (Cross talk.)
24          MR. ACOSTA:  Objection.  Form.
25          THE WITNESS:  You haven't given me enough    15:11:10
                                                          Page 119
```

```
 1  information of this hypothetical system -- to access    15:11:12
 2  it.
 3  BY MR. MARTON:
 4  Q.  What more information do you need?  What more
 5  information do you need?                               15:11:19
 6  A.  Well, all I really actually need to know is:  Is
 7  there securely storing of account information at -- at
 8  the toolbar?
 9      So if there's not account information, it's not
10  met.                                                   15:11:31
11      If it's not at the toolbar, it's not met.
12      And if there's not securely storing.
13      And I would just need to -- you know, this -- the
14  information at the toolbar is not accessible to someone
15  who just jumps onto your computer.  Right?  So --      15:11:44
16  Q.  Well, hold on.  Hold on.  We're not talking
17  about -- so account information -- that's met.  At the
18  browser toolbar -- that's met.
19      The question I have is about securely storing.
20      And so I'm storing account information at the      15:11:57
21  browser toolbar.  The account information is encrypted.
22      However, it can be decrypted using a
23  three-ASCII-character password.
24      Has that account information been securely stored,
25  as required by Claim 1 of the '122 Patent?            15:12:14
                                                          Page 120
```

```
 1          MR. ACOSTA:  Objection.  Form.                 15:12:20
 2          THE WITNESS:  I'm missing in this ill-defined
 3  hypothetical how the X -- that -- what the relationship
 4  is between this ASCII code and the toolbar at the time
 5  of this storing securely the account information.     15:12:37
 6  BY MR. MARTON:
 7  Q.  There's no relationship between the ASCII code and
 8  the toolbar.
 9      It's just a password could be typed in to decrypt
10  my account information.                                15:12:52
11      Has it been securely stored?
12          MR. ACOSTA:  Objection.  Form.
13  BY MR. MARTON:
14  Q.  Three-ASCII-character password could be used to
15  decrypt and access my account information?            15:13:03
16  (Cross talk.)
17          MR. ACOSTA:  Objection.  Form.  Objection --
18          THE WITNESS:  I'm not -- I'm not
19  understanding your hypothetical, because the storing is
20  at the toolbar.  When you say that --                  15:13:14
21  BY MR. MARTON:
22  Q.  Fine.  Then how about this?
23  A.  -- there is no relationship between the --
24  Q.  How about this?  How about this?  How about this?
25  Let's -- let's -- we're low on time, and I -- I       15:13:20
                                                          Page 121
```

31 (Pages 118 - 121)

```
 1  understand that to encrypt or decrypt can be done      16:40:32
 2  asymmetrically or symmetrically.
 3      But Dr. Jakobsson indicated that in his background
 4  section.
 5  Q.  Okay.                                              16:40:44
 6  A.  The example that's shown here uses a public key,
 7  which, even though it's not explicit, throughout the
 8  discretion, and the claims don't all require a private
 9  key, you know, one would infer from that, that you
10  could use a public and a private key, which would be   16:41:02
11  asymmetric.
12      And then one would also infer from this that you
13  could certainly use symmetric -- I'm not sure where.
14  To me, it's -- it's -- I guess it's pretty obvious.
15  These symmetric or asymmetric -- I'm not sure where    16:41:22
16  that came up with, as a concern.
17      It's not in any of the claims.
18          MR. MARTON:  Okay.  Thank you for your time
19  today.  I have no further questions.
20          THE WITNESS:  You're welcome.                  16:41:34
21          THE VIDEOGRAPHER:  All right.  I'll take us
22  off the record.
23      So the time is now 12 -- sorry -- 4:42 p.m.  This
24  concludes today's testimony given by Jose Meléndez.
25      The total number of media used was four, and will  16:41:51
```
Page 166

```
 1  be retained by Veritext.  Thank you, everybody.        16:41:55
 2          MR. MARTON:  Thanks.
 3          MR. ACOSTA:  Thank you.
 4  (Time noted:  4:42 p.m.)
```
Page 167

```
 1          I, the undersigned, a Certified
 2  Shorthand Reporter of the State of California, do
 3  hereby certify:
 4      That the foregoing proceedings were taken before
 5  me at the time and place herein set forth; that any
 6  witnesses in the foregoing proceedings, prior to
 7  testifying, were placed under oath; that a verbatim
 8  record of the proceedings was made by me using machine
 9  shorthand which was thereafter transcribed under my
10  direction; further, that the foregoing is an accurate
11  transcription thereof.
12      I further certify that I am neither financially
13  interested in the action nor a relative or employee of
14  any attorney or any of the parties.
15      IN WITNESS WHEREOF, I have this date subscribed my
16  name.
17
18  Dated:  February 22, 2023
19
20
21
22          _Lydia Zinn_
23          LYDIA ZINN, RPR, FCRR
24          CSR No. 9223
25
```
Page 168

```
 1  Ryan Marton, Esq
 2  ryan@martonribara.com
 3                   February 22, 2023
 4  RE: Zoho Corporation vs Liberty Peak Ventures, LLC
 5  2/20/2023, JOSÉ LUIS MELÉNDEZ, PH.D., JOB NO. 5771887
 6  The above-referenced transcript has been
 7  completed by Veritext Legal Solutions and
 8  review of the transcript is being handled as follows:
 9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10     to schedule a time to review the original transcript at
11     a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13     Transcript - The witness should review the transcript and
14     make any necessary corrections on the errata pages included
15     below, noting the page and line number of the corrections.
16     The witness should then sign and date the errata and penalty
17     of perjury pages and return the completed pages to all
18     appearing counsel within the period of time determined at
19     the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21     Counsel - Original transcript to be released for signature
22     as determined at the deposition.
23  __ Signature Waived – Reading & Signature was waived at the
24     time of the deposition.
25
```
Page 169